**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **CAITLIN JOHNSON,** on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>**EL CENTRO DEL BARRIO d/b/a/ CENTROMED,**<br><br>Defendant. | Case No.:  5:23-cv-01200<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Caitlin Johnson ("Plaintiff"), individually and on behalf of all others similar situated ("Class Members"), brings this Class Action Petition against Defendant El Centro del Barrio d/b/a/ CentroMed (hereinafter "CentroMed" or "Defendant"), a Texas corporation. Plaintiff seeks damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of counsel, and facts that are a matter of public record.

## INTRODUCTION

1.    Plaintiff brings this class action against CentroMed for its failure to properly secure and safeguard Plaintiff's and other similar situated individuals' personal identifiable information ("PII") and protected health information ("PHI"), including name, address, date of birth, Social Security number, financial account information, medical records number, health insurance plan member ID, and claims data (including diagnoses listed on claims)

(cumulatively, the PII and PHI defined as "Private Information") from an unauthorized third party.

2.      This class action raises out of the recent targeted cyberattack against CentroMed that allowed a third party to access CentroMed's computer systems and data, resulting in the compromise of highly sensitive personal information (the "Data Breach"). Because of the Data Breach, Plaintiff and Class Members suffered ascertainable losses in the form of the benefit of their bargain, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the attack, emotional distress, and the imminent risk of future harm caused by the compromise of their sensitive personal information.

3.      CentroMed is incorporated in Texas with its principal office located in San Antonio, Texas.  CentroMed is a primary care service provider that has multiple locations throughout Texas.

4.      On or about June 12, 2023, CentroMed was alerted to a potential unauthorized access to its computer network, and it subsequently, and formally, opened an investigation to uncover the details of the Data Breach. The investigations initial conclusions found that on or about June 9, 2023, an unauthorized third party accessed CentroMed's computer network.[1]

5.      On or about August 11, 2023, approximately two months after becoming aware of the Data Breach, CentroMed began providing notice to individuals whose information may have been involved in the incident.[2]

6.      Upon information and belief, the information compromised in the Data Breach is confidential personally identifiable information and personal health information of CentroMed's current and former patients.

---

[1] https://centromedsa.com/wp-content/uploads/2023/08/Notice_2023_Aug_11_2023l.pdf
[2] *Id.*

7.      Plaintiff brings this class action lawsuit on behalf of herself and those similarly situated to address CentroMed's inadequate safeguarding of Class Members' Private Information that Defndant collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their Private Information had been subject to the unauthorized access of an unknown third party or precisely what specific type of information was access.

8.      Upon information and belief, CentroMed maintained the Private Information in a reckless manner, leaving such Private Information susceptible to exploitation by an unknown third party. In particular, the Private Information was maintained on CentroMed's computer network in a condition vulnerable to a cyberattack.

9.      Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to CentroMed, thus CentroMed was on notice that failing to take steps necessary to secure the Private Information from those risks left that sensitive and valuable property in a dangerous condition.

10.     In addition, upon information and belief, CentroMed failed to properly monitor the computer network and IT systems that contained the Private Information.

11.     Plaintiff's and Class Members' identities are now at risk because of CentroMed's  negligent conduct – since the Private Information that CentroMed collected and maintained is now in the hands of data thieves.

12.     Armed with the Private Information accessed in the Data Breach, data thieves now have free reign to commit a variety of crimes including, *inter alia*, opening new financial accounts in Plaintiff's and Class Members' names, taking out loans in Plaintiff's and Class Members' names, using Plaintiff's and Class Members' names to obtain medical services, using Plaintiff's and Class Members' information to obtain government benefits, filing fraudulent tax

returns using Plaintiff's and Class Members' information, obtaining driver's licenses in Plaintiff's and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

13.    Consequently, because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now—and in the future—closely monitor their financial accounts to guard against identity theft.

14.    Plaintiff and Class Members may also incur out-of-pocket expenses – purchasing credit monitoring services, credit freezes, credit reports, or other protective measures – to deter and detect identity theft.

15.    By her Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

16.    Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvement to CentroMed's data security systems, future annual audits, and adequate credit monitoring services funded by CentroMed.

17.    Accordingly, Plaintiff brings this action against CentroMed seeking redress for its unlawful conduct and asserting claims for: (1) negligence; (2) breach of contract; (3) negligence per se; (4) breach of fiduciary duty; (5) intrusion upon seclusion/invasion of privacy; (6) unjust enrichment; (7) violation of the Texas Medical Practices Act; (8) violation of the Texas Hospital Licensing Law, and (9) declaratory judgment.

## PARTIES

18.    Plaintiff Caitlin Johnson ("Plaintiff" or "Johnson") is a natural person and a citizen of the State of Texas. Plaintiff resides in San Antonio Texas, in Bexar County.

19.     Defendant El Centro Del Barrio d/b/a CentroMed is a healthcare company incorporated under the state laws of Texas, with its principal place of business located at 3750 Commercial Avenue, San Antonio, Texas 78221.  The registered agent for service of process is Ernesto Gomez located at 3750 Commercial Ave., San Antonio, TX 78221.

## JURISDICTION AND VENUE

20.     This court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Upon information and belief, the number of class members if over 100, many of whom have different citizenship from CentroMed. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21.     This Court has general personal jurisdiction over CentroMed because their principal place of business is located in the San Antonio Division of the Western District of Texas and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District. Specifically, CentroMed has its principal place of business in the San Antonio Division of the Western District of Texas, and, moreover, CentroMed, as a Texas corporation with offices only in Texas, and conducts the vast majority of its business in Texas.

22.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because CentroMed maintains its principal place of business within the San Antonio Division of the Western District of Texas and because a substantial part of the acts or omissions giving rise to this action occurred within this District.

## FACTUAL ALLEGATIONS

**A.  CentroMed's Business and Collection of Plaintiff's and Class Members' Private Information.**

23.     CentroMed is a Texas company whose ultimate mission is to be "an integrated primary care clinic that provides accessible services of superior quality."[3]

24.     CentroMed's, in offering "affordable, culturally competent, and geographically accessible primary care services" provides the following[4]:

## Commitment to Customer Service

Our consumer-majority Board of Directors monitor and ensure that customer service is evident at all service sites.

## Mission

CentroMed is an integrated primary care clinic that provides accessible services of superior quality.

## Vision

CentroMed will be a Premier Primary Care Clinic recognized for quality customer service, clinical excellence, comprehensive care and responsiveness to community needs.

25.     As a condition of providing primary care service to Plaintiff and Class Members, CentroMed requires that its clients, who are patients, entrust it with highly sensitive personal and health information belonging to Plaintiff and Class Members, including Private Information.

26.     Due to the highly sensitive and personal nature of the information CentroMed acquires and stores with respect to its clients' and patients' Private Information, CentroMed, upon information and belief, promises to, among other things: keep the Private Information entrusted to it private; comply with industry standards related to data security and the maintenance of its clients' and patients' Private Information; inform its clients' and patients' of its legal duties relating to data security and comply with all federal and state laws protecting the Private Information entrusted to it; only use and release its clients' and patients' Private

---

[3]  https://centromedsa.com/about-us/
[4]  https://centromedsa.com/about-us/

Information for reasons that relate to the services it provides; and provide adequate notice to clients' patients if their Private Information is disclosed without authorization.

27.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, CentroMed assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Member's Private Information from unauthorized disclosure and exfiltration.

28.    Plaintiff and Class Members relied on CentroMed to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which CentroMed ultimately failed to do.

**B.    *The Data Breach and CentroMed's Inadequate Notice to Plaintiff and Class Members***

29.    On June 12, 2023, CentroMed discovered suspicious activity on its systems. CentroMed purports that it initiated an investigation and took containment measures at that point, but those measures were patently insufficient.[5]

30.    CentroMed later admitted that third-party hackers gained access to its systems and to the highly sensitive PII and PHI of Plaintiff and Class Members. Upon information and belief, during the Data Breach, the hackers copied and/or exfiltrated substantial amounts of Plaintiff's and Class Members' Private Information and Private Health Information.[6]

31.    CentroMed waited approximately two months to start providing notice to the individuals impacted by the Data Breach. As stated by CentroMed in its Notice of Data Security Incident:

> **Steps We Are Taking:**
> On August 11, 2023, CentroMed began providing notice to individuals whose information may have been involved in the incident. In addition, CentroMed established a dedicated, toll-free call center to answer questions that individuals may have. We take this incident very seriously and sincerely regret any concern this may cause. To help prevent something like this from happening again, we

---

[5] https://centromedsa.com/wp-content/uploads/2023/08/Notice_2023_Aug_11_2023l.pdf
[6] *Id.*

have implemented additional safeguards and technical security measures to further protect and monitor our systems.[7]

32.    Specifically, despite identifying the Data Breach on June 12, 2023, CentroMed did not notify Plaintiff and Class Members until, at earliest, August 11, 2023. Had CentroMed provided notice sooner, Plaintiff and Class Members would have been able to take containment steps sooner.

33.    CentroMed claims that it is "committed to protecting the security and privacy of the information we maintain."[8] Nevertheless, through the Data Breach, unauthorized third parties accessed a cache of highly sensitive Private Information, including clients' and patients' names, addresses, date of births, Social Security Numbers, financial account information, medical records numbers, health insurance plan member IDs, and claims data (including diagnoses listed on claims.[9]

34.    CentroMed had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

35.    Plaintiff and Class Members provided their Private Information to CentroMed with the reasonable expectation and mutual understanding that CentroMed would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

36.    CentroMed data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

37.    CentroMed knew or should have known that its electronic records would be targeted by cybercriminals.

---

[7] https://centromedsa.com/wp-content/uploads/2023/08/Notice_2023_Aug_11_2023l.pdf
[8] *Id.*
[9] *Id.*

**C.** ***The Healthcare Sector is Particularly Susceptible to Data Breaches***

38.    CentroMed was on notice that companies in the healthcare industry are particularly susceptible targets for data breaches.

39.    CentroMed was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[10]

40.    The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[11]

41.    The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[12] In 2022, the largest growth in compromises occurred in the healthcare sector.[13]

42.    Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average

---

[10] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on August 9, 2023).
[11] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on August 9, 2023).
[12] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on August 9, 2023).
[13] Identity Theft Resource Center, *2022 End-of-Yeare Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on August 9, 2023).

total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[14]

43.     Almost 50 percent of the victims lost their healthcare coverage because of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[15]

44.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[16]

45.     As a primary care service provider, CentroMed knew, or should have known, the importance of safeguarding its patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on CentroMed's patients because of a breach. CentroMed failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[14] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on August 9, 2023).

[15] *Id*.

[16] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on August 9, 2023).

### D. *CentroMed Failed to Comply with HIPAA*

46.     Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI like the data CentroMed left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

47.     CentroMed's Data Breach resulted from a combination of insufficiencies that indicate CentroMed failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from CentroMed's Data Breach that CentroMed either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

48.     Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

49.     45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

50.     45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

51.     Plaintiff's and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

52.    Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, because of the Data Breach.

53.    Based upon CentroMed's Notice to Plaintiff and Class Members, CentroMed reasonably believes that Plaintiff's and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, because of the Data Breach.

54.    Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E because of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

55.    CentroMed reasonably believes that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E because of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

56.    Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E because of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

57.    Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E because of the Data Breach.

58.    CentroMed reasonably believes that Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E because of the Data Breach.

59.    It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR,

Subpart E because of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

60.     It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

61.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

62.     In addition, CentroMed's Data Breach could have been prevented if CentroMed had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

63.     CentroMed's security failures also include, but are not limited to:

a.   Failing to maintain an adequate data security system to prevent data loss;

b.   Failing to mitigate the risks of a data breach and loss of data;

c.   Failing to ensure the confidentiality and integrity of electronic protected health information CentroMed creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.  Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.  Failing to ensure compliance with HIPAA security standard rules by CentroMed's workforce, in violation of 45 CFR 164.306(a)(94); and

*k.*  Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

64.  Because CentroMed has failed to comply with HIPAA, while monetary relief may cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure CentroMed's approach to information security is adequate and appropriate going forward. CentroMed still maintains the PHI and other highly sensitive PII of its current and former patients, including Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

### E. *CentroMed Failed to Comply with FTC Guidelines*

65.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

66.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

67.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

68.    The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably by treating the failure to employ reasonable

and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69.     As evidenced by the Data Breach, CentroMed failed to properly implement basic data security practices. CentroMed's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

70.     CentroMed was always fully aware of its obligation to protect the Private Information of its patients yet failed to comply with such obligations. CentroMed was also aware of the significant repercussions that would result from its failure to do so.

**F.  *CentroMed Failed to Comply with Industry Standards***

71.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

72.     Some industry best practices that should be implemented by businesses dealing with sensitive PHI like CentroMed include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, CentroMed failed to follow some or all these industry best practices.

73.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and

training staff regarding these points. As evidenced by the Data Breach, CentroMed failed to follow these cybersecurity best practices.

74.     CentroMed failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

75.     CentroMed failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### G. *CentroMed Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information*

76.     In addition to its obligations under federal and state laws, CentroMed owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. CentroMed owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

77.     CentroMed breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. CentroMed's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

   b.   Failing to adequately protect patients' Private Information;

c.   Failing to properly monitor its own data security systems for existing intrusions;

d.   Failing to sufficiently train its employees regarding the proper handling of its patients Private Information;

e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f.   Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

g.   Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

78.   CentroMed negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

79.   Had CentroMed remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

80.   Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What is more, they have been harmed because of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with CentroMed.

**H.  CentroMed Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft**

81.   The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security

incidents such as data breaches or unauthorized disclosure of data.[17] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

82.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities to engage in illegal financial transactions under the victims' names.

83.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity or data thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

84.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the

---

[17] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on August 9, 2023).

"mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

85.    Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

86.    For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[18] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

87.    Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

---

[18] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited August 9, 2023).

88.     In fact, a study by the Identity Theft Resource Center[19] shows the multitude of harms caused by fraudulent use of PII:



89.     PHI is also especially valuable to identity thieves. As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[20]

90.     Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

91.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[21]

92.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements.

---

[19] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited on August 9, 2023).
[20] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on August 9, 2023).
[21] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on August 9, 2023).

It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

93.    Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[22]

94.    The ramifications of CentroMed's failure to keep client's Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years, if not a lifetime.

95.    Here, not only was sensitive medical information compromised, but Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

96.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[23]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit

---

[22] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on August 9, 2023).

[23] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited August 9, 2023).

identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

97.     PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

98.     As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

## I.    *Plaintiff's and Class Members' Damages*

99.     Defendant came into possession of Plaintiff Johnson's Private Information through provision of its services, where Plaintiff Johnson received medical care through her most recent pregnancy from Defendant at CentroMed Noemi Glavan Eling Clinic in San Antonio, Texas.

100.    When Plaintiff became a patient of CentroMed, Defendant required that Plaintiff provide it with substantial amounts of her PII and PHI.

101.    In mid-August, 2023 Plaintiff received an email entitled "Notice of Data Security Incident/ Aviso de Incidente de Seguridad de Datos" which informed Plaintiff Johnson about "a data security incident that may have resulted in unauthorized access to some of your information." That notice further informed Plaintiff Johnson that her PII and PHI may have been accessed during the Data Breach including her "name, address, date of birth, Social Security number, financial account information, medical records number, health insurance plan member ID, and claims data (including diagnoses listed on claims."

102.    The notice letter informed Plaintiff Johnson how to activate identity protection, consisting of:

ADDITIONAL STEPS YOU CAN TAKE TO PROTECT YOUR INFORMATION We remind you it is always advisable to be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity. You may obtain a copy of your credit report, free of charge, once every 12 months from each of the three nationwide credit reporting companies. To order your annual free credit report, please visit www.annualcreditreport.com or call toll free at 1-877-322-8228. Contact information for the three nationwide credit reporting companies is as follows: • Equifax, PO Box 740241, Atlanta, GA 30374, www.equifax.com, 1-800-685-1111 • Experian, PO Box 2002, Allen, TX 75013, www.experian.com, 1-888-397-3742 • TransUnion, PO Box 1000, Chester, PA 19016, www.transunion.com, 1-800-916-880[24]

103.    One free credit report for one year of credit monitoring is not sufficient given that Plaintiff will now experience a lifetime of increased risk of identity theft, including but not limited to, potential medical fraud.

104.    Plaintiff Johnson suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

105.    Plaintiff would not have provided her PII and PHI to Defendant had she been aware of Defendant's inadequate data security practices to safeguard its clients' patients' personal and health information from theft, and that those systems were subject to a data breach.

106.    Plaintiff suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

107.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her personal and health information – a form of intangible property that Plaintiff entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

---

[24] https://centromedsa.com/wp-content/uploads/2023/08/Notice_2023_Aug_11_2023l.pdf

108.    Plaintiff Johnson, following the Data Breach, received and continues to receive an inordinate amount of spam texts, telephone calls from random phone numbers and a surge of spam emails to her personal account.  Ms. Johnson, who is involved in the technology industry and received a certification in software engineering, "knows how valuable data is and what can happen to it" and is "nervous and on alert" with concern for her children's Private Information in addition to her own, as a result of the Data Breach.

109.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

110.    Plaintiff has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendant, are protected and safeguarded from future breaches.

111.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the legitimacy of the Data Breach, researching the rationale as to why it took Defendant so long to communicate to her that her Private Information was stolen, reviewing financial and credit accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Johnson has spent nearly 15 hours to date dealing with the Data Breach, valuable time she otherwise would have spent on other activities, and anticipates spending a substantial additional amount of time unsubscribing from online accounts and using hyper-vigilance prior to clicking on any internet links.

112.    As a result of the Data Breach, Plaintiff has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff is very concerned about this

increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

113.    Plaintiff Ballard also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff ; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

114.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

115.    In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

116.    Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

117.    Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

118.    As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

119.    Further, and as set forth above, as a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including

placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

120.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

121.    Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

122.    The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

123.    Additionally, Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[20] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[21]

124.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily

available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

125.    Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

126.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendant, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

127.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23.

129.    Specifically, Plaintiff proposes the following Class (referred to herein as the "Class"), subject to amendment as appropriate:

> "All individuals in the United States who had Private Information accesses and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach."

130.    Excluded from the Class are CentroMed and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal

representatives, heirs, predecessors, successors, and assigns. Also excluded is any judge to whom this case is assigned as well as their judicial staff and immediate family members.

131.    Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification.

132.    <u>Numerosity</u>. The Class Members are numerous such that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of over 350,000 persons whose Private Information was compromised in the Data Breach.

133.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

       a.  Whether CentroMed engaged in the conduct alleged herein;

       b.  Whether CentroMed's conduct violated the FTCA, HIPAA, and/or North Carolina Unfair and Deceptive Trade Practices Act;

       c.  When CentroMed learned of the Data Breach;

       d.  Whether CentroMed's response to the Data Breach was adequate;

       e.  Whether CentroMed unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

       f.  Whether CentroMed failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

       g.  Whether CentroMed's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether CentroMed's data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether CentroMed owed a duty to Class Members to safeguard their Private Information;

j.  Whether CentroMed breached its duty to Class Members to safeguard their Private Information;

k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether CentroMed had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.  Whether CentroMed breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.  Whether CentroMed knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class Members suffered as a result of CentroMed's misconduct;

p.  Whether CentroMed's conduct was negligent;

q.  Whether CentroMed's conduct was *per se* negligent;

r.  Whether CentroMed was unjustly enriched;

s.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

t.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

u.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

134.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of CentroMed. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

135.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

136.  <u>Predominance</u>. CentroMed has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from CentroMed's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

137.  <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims

is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for CentroMed. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

138.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). CentroMed has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

139.    Finally, all members of the proposed Class are readily ascertainable. CentroMed has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by CentroMed.

## CLAIMS FOR RELIEF

### COUNT 1
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

140.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

141.    CentroMed knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

142.    CentroMed required Plaintiff and Class Members to submit non-public personal information to obtain healthcare services, which they then stored and maintained in its computer networks.

143.    By collecting and storing this data in CentroMed's computer systems, CentroMed had incurred a duty of care to use reasonable means to secure and safeguard its computer property – and Plaintiff's and Class Members' Private Information held within it – to prevent disclosure of the information, and to safeguard the information from theft. CentroMed's duties included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

144.    CentroMed knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. CentroMed was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

145.    CentroMed owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. CentroMed's duties included, but were not limited to, the following:

      a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

      b.   To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

      c.   To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

      d.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

e.  To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

146.  CentroMed's duty to use reasonable security measures under HIPAA require CentroMed to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R § 164.520(c)(1). Some or all the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

147.  CentroMed's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

148.  CentroMed's duty also arose because Defendant was bound by industry standards to protect its clients' patients' confidential Private Information.

149.  Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of CentroMed, and CentroMed owed them a duty of care to not subject them to an unreasonable risk of harm.

150.  CentroMed, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within CentroMed's possession.

151.  CentroMed, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

152.    CentroMed, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

153.    CentroMed breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by CentroMed include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of its networks and systems;

c.    Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to comply with the FTCA; and

f.    Failing to detect, in a timely manner, the vulnerability that led to the Data Breach of its systems.

154.    CentroMed had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust CentroMed with their Private Information was predicated on the understanding that CentroMed would take adequate security precautions. Moreover, only CentroMed had the ability to protect its systems (and the Private Information that it stored on them) from attack.

155.    CentroMed's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

156.    CentroMed's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

157.    As a result of CentroMed's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

158.    CentroMed also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

159.    As a direct and proximate result of CentroMed's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

160.    The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

161.    Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

162.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring CentroMed to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiff and All Class Members)

163.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

164.    When Plaintiff and Class Members provided their Private Information to CentroMed in exchange for CentroMed's services, they entered into implied contracts with CentroMed under which CentroMed agreed to reasonably protect such information.

165.    CentroMed solicited, offered, and invited Class Members to provide their Private Information as part of CentroMed's regular business practices. Plaintiff and Class Members accepted CentroMed's offers and provided their Private Information to CentroMed.

166.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that CentroMed's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

167.    Plaintiff and Class Members paid money to CentroMed or provided their Private Information to CentroMed with the reasonable belief and expectation that CentroMed would use part of its earnings to obtain adequare data security. CentroMed failed to do so.

168.    Plaintiff and Class Members would not have entrusted their Private Information to CentroMed in the absence of the implied contract between them and CentroMed to keep their Information reasonably secure.

169.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with CentroMed.

170.    CentroMed breached its implied contracts with Plaintiff and Class Members by failing to safeguard and protect their Private Information.

171.    As a direct and proximate result of CentroMed's breach of implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

172.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

173.    Plaintiff and Class Members are also entitled to injunctive relief requiring CentroMed to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### THIRD CAUSE OF ACTION
**Negligence Per Se**
**(On Behalf of Plaintiff and All Class Members)**

174.    Plaintiff re-alleges and incorporates by reference all other paragraph in the Complaint as if fully set forth herein.

175.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, CentroMed had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

176.    Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., CentroMed had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

177.    Pursuant to HIPAA, CentroMed had a duty to render the electronic Private Information and Private Health Information it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

178.    CentroMed breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

179.    CentroMed's failure to comply with applicable laws and regulations constitutes negligence per se.

180.    But for CentroMed's wrongful and negligent breach of its duties owed to Plaintiff's and Class Members, Plaintiff and Class Members would not have been injured.

181.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of CentroMed's breach of its duties. CentroMed knew or should have known that it was failing to meet its duties, and that CentroMed's breach would Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

<u>**FOURTH CAUSE OF ACTION**</u>
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and All Class Members)**

182.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

183.    Considering the special relationship between CentroMed and its clients' patients, whereby CentroMed became a guardian of Plaintiff's and Class Members' Private Information (including highly sensitive, confidential, personal, and other PHI) CentroMed was a fiduciary, created by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its clients' patients, including Plaintiff and Class Members. This benefit included (1) the safeguarding of Plaintiff's and Class Members' Private Information; (2) timely notifying Plaintiff and Class Members of the Data Breach; and (3) maintaining complete and accurate records of what and where CentroMed's clients' Private Information was and is stored.

184.    CentroMed had a fiduciary duty to act for the benefit of Plaintiff and the Class Members upon matters within the scope of their customer/patient relationship, in particular to keep secure the PII of their customers/patients.

185.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to diligently investigate the Data Breach to determine the number of Class Members affected and notify them within a reasonable and practicable period of time.

186.    CentroMed breached its fiduciary duties to Plaintiff and the Class by failing to protect their Private Information.

187.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic PHI CentroMed created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

188.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

189.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

190.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

191.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 CFR 164.306(a)(2).

192.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that

are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

193.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce, in violation of 45 CFR 164.306(a)(94).

194.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

195.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to effectively train all members of their workforce (including independent contractors and/or agents) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5).

196.    CentroMed breached its fiduciary duties to Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. § 164.530(c).

197.    CentroMed breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PII/PHI.

198.    As a direct and proximate result of CentroMed's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII/PHI is used; (iii) the compromise, publication, and/or theft of their PII/PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized

use of their PII/PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII/PHI, which remain in CentroMed's possession and is subject to further unauthorized disclosures so long as CentroMed fail to undertake appropriate and adequate measures to protect the PII/PHI of customers/patients and former customers/patients in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (ix) the diminished value of CentroMed's goods and services they received.

199.    As a direct and proximate result of CentroMed's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer the harms and injuries alleged herein, as well as anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and Class Members)

200.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

201.    Plaintiff and Class Members conferred a benefit on CentroMed by turning over their valuable Private Information to CentroMed in exchange for cybersecurity measures sufficient to protect their Private Information from unauthorized access and disclosure. Plaintiff and Class Members did not receive such protection.

202.    Upon information and belief, CentroMed funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff's and Class Members (CentroMed's patients).

203.    As such, a portion of these payments made to CentroMed is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to CentroMed.

204.    CentroMed has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members, which payment should have been used for adequate cybersecurity practices that it failed to provide.

205.    CentroMed knew that Plaintiff and Class Members conferred a benefit upon it, which CentroMed accepted. CentroMed profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

206.    If Plaintiff and Class Members had known that CentroMed had not adequately secured their Private Information, they would not have agreed to the provision of such Private Information to CentroMed.

207.    Due to CentroMed's conduct alleged herein, it would be unjust and inequitable under the circumstances for CentroMed to be permitted to retain the benefit of its wrongful conduct.

208.    As a direct and proximate result of CentroMed's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication,

and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

209.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from CentroMed and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by CentroMed from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

210.    Plaintiff and Class Members may not have an adequate remedy at law against CentroMed, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**SIXTH CAUSE OF ACTION**

**Violation of Texas Medical Practice Act ("TMPA")**
**Tex. Occ. Code §§ 159.001, *et seq.***
**(On Behalf of Plaintiff and the Class)**

211.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

212.    Under Tex. Occ. Code § 159.002(a)-(b), communications between a physician and a patient, relative or in connection with any professional services as a physician to the patient, including records of the identity, diagnosis, evaluation, or treatment of a patient by a physician that is created or maintained by a physician, are confidential and privileged.

213.    Under Tex. Occ. Code § 59.002(c), a person, including a hospital, that receives information from a confidential communication or record as described above and acts on the patient's behalf, may not disclose such information except to the extent that disclosure is consistent with the authorized purposes for which the information was first obtained.

214.    CentroMed's above-described wrongful actions, inaction and/or omissions that caused the Data Breach, caused the unauthorized disclosure of Plaintiff's and Class Members' PII/ PHI, and caused Plaintiff and Class Members to suffer the resulting harm and damages collectively constitute the unauthorized release of confidential and privileged communications in violation of the TMPA. Plaintiff and Class Members, therefore, are entitled to injunctive relief and/or recover their damages under Tex. Occ. Code § 159.009.

**SEVENTH CAUSE OF ACTION**
**Violation of the Texas Hospital Licensing Law**
**Tex. Health & Safety Code §§ 241.001, *et seq.***
**(On Behalf of Plaintiff and the Class)**

215.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

216.    Under Tex. Health & Safety Code § 241.151(2), "health care information" is any information, including payment information, recorded in any form of medium that identifies a patient and relates to the history, diagnosis, treatment, or prognosis of a patient.

217.    Under Tex. Health & Safety Code § 241.152(a), except as authorized by Tex. Health & Safety Code § 241.153 (which does not apply here), a hospital or an agent or employee of a hospital may not disclose health care information about a patient to any person

other than the patient or the patient's legally authorized representative without the written authorization of the patient or the patient's legally authorized representative.

218.    Under Tex. Health & Safety Code § 241.155, a hospital shall adopt and implement reasonable safeguards for the security of all health care information it maintains.

219.    CentroMed's above-described wrongful actions, inaction and/or omissions that caused the Data Breach, caused the unauthorized disclosure of Plaintiff's and Class Members' PII/ PHI, and caused Plaintiff and Class Members to suffer the resulting harm and damages collectively constitute: (i) the unauthorized disclosure of Plaintiff's and Class Members' health care information to unauthorized parties, and (ii) CentroMed's failure to adopt and implement reasonable safeguards for the security of Plaintiff's and Class Members' PHI entrusted to it— both of which are violations of the Texas Hospital Licensing Law. Plaintiff and Class Members, therefore, are entitled to injunctive relief and/or to recover their damages under Tex. Health & Safety Code § 241.156.

**EIGHTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiff and Class Members)**

220.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

221.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations and state statute[s] described in this Complaint.

222.    CentroMed owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

223.    CentroMed still possesses Private Information regarding Plaintiff and Class Members.

224.    Plaintiff alleges that CentroMed's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury because of the compromise of her Private Information and the risk remains that further compromises of her Private Information will occur in the future.

225.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  CentroMed owes a legal duty to secure its clients' patients' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

b.  CentroMed's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect its clients' patients' Private Information; and

c.  CentroMed continues to breach this legal duty by failing to employ reasonable measures to secure its clients' patients' Private Information.

226.    This Court should also issue corresponding prospective injunctive relief requiring CentroMed to employ adequate security protocols consistent with legal and industry standards to protect its clients' patients' Private Information, including the following:

a.  Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b.  Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

i.      engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering CentroMed to promptly correct any problems or issues detected by such third-party security auditors;

ii.     engaging third-party security auditors and internal personnel to run automated security monitoring;

iii.    auditing, testing, and training its security personnel regarding any new or modified procedures;

iv.    segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of CentroMed's systems;

v.     conducting regular database scanning and security checks;

vi.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.   meaningfully educating its clients and their patients about the threats they face regarding the security of their Private Information, as well as the steps they should take to protect themselves.

227.    If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at CentroMed. The risk of another such breach is real, immediate, and substantial. If another breach at CentroMed occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

228.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to CentroMed if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of CentroMed's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and CentroMed has a pre-existing legal obligation to employ such measures.

229.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at CentroMed, thus preventing future injury to Plaintiff and other patients whose Private Information would be further compromised.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a.  An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b.  Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing Defendant to purchase or provide funds for credit monitoring and identity theft insurance to Plaintiff and Class Members for not less than a five-year period;

e.  An order requiring Defendant to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for any and all triable issues in this action so triable as of right.

Dated: September 26, 2023                          Respectfully submitted,

*/s/ Joe Kendall*
JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone:  214/744-3000
Facsimile:  214/744-3015
jkendall@kendalllawgroup.com

Jennifer S. Czeisler (*pro hac vice* to be filed)
**STERLINGTON PLLC**
One World Trade Center
85th Floor
New York, New York 10007
Telephone: (212) 433-2993
Jen.czeisler@sterlingtonlaw.com

Edward Ciolko (*pro hac vice* to be filed)
**STERLINGTON PLLC**
One World Trade Center
85th Floor
New York, New York 10007
Telephone: (212) 433-2993
Edward.ciolko@sterlingtonlaw.com

James M. Evangelista (*pro hac vice* to be
filed)
**EVANGELISTA WORLEY LLC**
500 Sugar Mill Road
Suite 245A
Atlanta, GA 30350
Tel.: 404-205-8400
Fax: 404-205-8395
Email: jim@ewlawllc.com

*Attorneys for Plaintiff*